## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DON EMERY,<br><br>Plaintiff,<br><br>v.<br><br>SALT LAKE CITY CORPORATION, OFFICER TIMOTHY STUMM, OFFICER KEVIN STAYNER of the SALT LAKE CITY POLICE DEPARTMENT, and UNNAMED OFFICERS OF THE SALT LAKE POLICE DEPARTMENT, individually and in their official capacity, and JOHN DOES 1-10,<br><br>Defendants. | **ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGEMENT**<br><br>Case No. 2:13-cv-00860-RJS<br><br>District Judge Robert J. Shelby |

Plaintiff Don Emery seeks in this case to recover for injuries he allegedly received during a traffic stop in Salt Lake City in the early evening of March 30, 2010. Emery was stopped for driving with an expired car registration, but it was soon determined that his car would need to be impounded because his driver's license was suspended. After he removed his belongings from his car, and a tow truck driver got his car onto a flatbed truck, Emery realized he was missing his house keys. He approached his car, opened the passenger side door, reached inside, got his keys from the ignition, and walked away. Salt Lake City Police Officers Timothy Stumm and Kevin Stayner then tackled and pinned him to the ground, punched, and Tased him multiple times.

Emery has sued Officers Stumm and Stayner, as well as Salt Lake City Corporation. He asserts against Officers Stumm and Stayner a claim pursuant to 42 U.S.C. § 1983 for excessive force in violation of the Fourth Amendment's prohibition of unreasonable seizures. There is no clearly-articulated claim separately asserted against Salt Lake City.

Salt Lake City and both Officers now move the court for summary judgment.[1]  They ask the court to conclude as a matter of law that: 1) there is no basis for municipal liability against Salt Lake City, and 2) the Fourth Amendment claim against the Officers[2] fails as a matter of law because they enjoy qualified immunity.

For the reasons discussed below, the court concludes Salt Lake City is entitled to summary judgment in view of the Complaint's allegations, prior rulings, and the evolution of the summary judgment briefing.  But Officers Stumm and Stayner have not established that summary judgment on qualified immunity grounds is appropriate.  Though the parties will undoubtedly advance starkly different versions of the facts at trial, the court at this summary judgment stage generally must accept Emery's version of disputed facts.  And Emery has come forward with evidence and legal authority to support a conclusion that—at least under the version of the facts the court must accept now—the Officers violated his Fourth Amendment rights under law that was clearly established at the time of his traffic stop.  The court thus cannot rule as a matter of law that the Officers are immune from suit.

## I.     Background

Below, the court sets forth below the facts that are established for purposes of evaluating Defendants' motion.  But the court first resolves two evidentiary objections Defendants raise in response to an affidavit Emery submitted in opposition to Defendants' motion.

---

[1] Dkt. 52, Motion for Summary Judgment and Memorandum in Support.

[2] Dkt. 4, Complaint and Jury Demand, at 7-9, First Cause of Action for "Excessive Force In Violation of the Fourth Amendment Cognizable Under 42 U.S.C. § 1983."  This is the lone remaining claim in this case.  *See* Dkts. 30 and 31, Minute Entry and Order Following Oral Ruling (dismissing Second, Third, Fourth, Fifth, and Sixth Causes of Action; denying Defendants' Motion for Judgment on the Pleadings on Plaintiff's First Cause of Action).

## A. Defendants' Evidentiary Objections to Emery's Affidavit

Emery testifies in an affidavit in support of his opposition to Defendants' motion that:[3]

> [t]he car was not moving, and the tow driver had turned the key to unlock the steering wheel lock without turning the car on. I opened the passenger door, reached into the car, and removed the ignition key from the ignition, which I believed had the remainder of my house and personal keys on it. I did not have any contact with the tow driver. I realized I did not have house keys or other necessary keys, so I went to the vehicle to retrieve my keys from the ignition. The tow truck driver was preparing to remove the vehicle and I did not believe the driver needed my keys to take the vehicle.[4]

Defendants object to this testimony on two grounds. First, they claim that Emery's statement that the "car was not moving" contradicts his prior deposition testimony, and thus is merely an attempt to create a "sham" issue of fact to avoid summary judgment. Second, they urge the court to disregard as lacking foundation Emery's statement that the tow driver "turned the key to unlock the steering wheel lock without turning the car on" because Emery was not in the car and directly viewing the steering wheel at that time, and thus lacked personal knowledge of those facts. The court addresses these objections in turn, overruling both.

### 1. Affidavit testimony that "the car was not moving"

If a party submits an affidavit in opposing summary judgment that conflicts with prior testimony, the court will disregard it "when it 'constitutes an attempt to create a sham fact issue.'"[5] "Factors to be considered in determining whether an affidavit presents a sham issue include 'whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit

---

[3] Dkt. 66-1. Defendants Officers Stumm and Stayner also submitted in support of the Defendants' Motion Declarations in which, over the course of five pages, they too discussed topics that had been covered in their prior depositions. Dkts. 52-2 and 52-3.

[4] Dkt. 66-1 at 2 ¶ 5.

[5] *Burns v. Board of County Com'rs of Jackson County,* 330 F.3d 1275, 1282 (10th Cir. 2003) (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)).

was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain.'"[6]  As discussed below, the court finds Defendants have failed to establish that there is a conflict between Emery's deposition testimony and the testimony he offers in the new affidavit.

Defendants contend Emery's affidavit testimony that the car was not moving when he opened the door and reached in conflicts with the following prior deposition testimony:

> Q. Okay. So tell me what you remember about the tow truck driver arriving and what the tow truck driver did.
>
> A. He got in -- first of all, he hooked up the chain to the front, I think on both sides, and he had put it into neutral and was winching it on, and I realized I didn't have my keys.
>
>  Q. Okay.
>
> A. So I jumped up, hang onto the car, and I went to the door, and I opened the door and reached for the keys, and I took the keys, and I stepped back away from the car, and there was no other keys. My keys were gone.
>
> Q. Oh, so you went back to go get your house keys out of --
>
> A. Out of the car.
>
> Q. And they didn't --
>
> A. And there was no keys except for the ignition key. And I'm sitting there, where's my keys, in my mind.
>
> Q. Okay.[7]

But upon comparing the affidavit and the deposition testimony, the court cannot conclude that there is a conflict.  Emery's deposition testimony was in response to an open-ended question from Defendants' counsel about "what the tow truck driver did."  Emery answered that he recalled that the tow truck driver chained the car, put the car in neutral, and was winching it when Emery then realized he did not have his keys.  Upon this realization, Emery jumped up and went to the car.  The deposition testimony is silent as to whether the car was in motion or still

---

[6] *Id.* (quoting *Franks*, 796 F.2d at 1237).

[7] Deposition of Don Emery at 77-78 (Dkt. 52-1 at  15-16).

when Emery opened the door and reached inside for his keys.  And Defendants' counsel did not seek clarification on that issue by asking Emery whether the car was moving or stopped when those actions occurred.  That question, or something like it, was not asked; thus no answer to it is before the court.  Emery's affidavit suggesting that the car was stopped when he opened the door and reached inside is therefore not in clear conflict with the deposition testimony.[8]

### 2. Affidavit testimony that the tow driver "turned the key to unlock the steering wheel lock without turning the car on"

Rule 56(c)(4), Federal Rules of Civil Procedure, provides that an affidavit "used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Defendants argue Emery lacks this requisite personal knowledge to testify what the tow truck operator did because he "was not in the vehicle and he did not personally observe the tow truck operator unlocking the steering wheel."[9]

But Defendants offer no citation to any testimony for the proposition that Emery was not observing the tow truck driver.  And while it is true he was not sitting inside the car, it does not follow from that fact alone that Emery could not have observed the tow truck driver taking his car, or is otherwise so lacking in personal knowledge of what the tow truck driver did that this statement must be excluded.

The evidence suggests Emery was close to the car as it was placed onto a flatbed truck, and he testified at some length in his deposition about what the tow truck driver was doing when Defendants' counsel questioned him on that subject.  Some of that deposition testimony is set

---

[8] In briefing Defendants' Summary Judgment Motion, Defendants also submit a witness statement from the tow truck driver, Lee Major, in which Major states that he "was about to load the vehicle when the owner got in the car & took the ignition key out & started to run away . . . ."  Lee Major Witness Statement dated March 30, 2010, given to Officer Stumm (Dkt. 52-1 at 111).  Major further states that "the officer stop [sic] him & he resisted [sic] would not follow what they told him to do, would not release key or give the officer his hands."  *Id.*

[9] Dkt. 75 at 16.

forth above—including that the driver put the car into neutral. The driver was also moving

Emery's car, and it is reasonable to infer that Emery was familiar with how his car operated and

sounded. It is also reasonable to infer that where Emery was not far away from the car, he might

have heard the engine if the car were started. Indeed, he testified multiple times in his deposition

upon questioning by Defendants' counsel that the car was not on:

> Q. Okay. But you don't remember him—was the engine on in the car?
> A. No.
> Q. It wasn't on?
> A. No.[10]

* * *

> Q. Q. Okay. And you don't remember the tow truck driver ever turning the car engine on?
> A. No. Never did. . . .[11]

Emery could see the car had been moving, but that the engine had not been started. Emery also

testified in his affidavit that he had previously worked as a tow truck driver. And, it is

undisputed that Emery reached into the car and got the keys. He reasonably could have

perceived at that close range if the car was on and the position of the keys.

Based upon the foregoing, both of Defendants' evidentiary objections to Emery's

affidavit testimony are overruled.

## B. Facts Relating to the Stop and the Officers' Conduct

Where genuinely disputed, the court "view[s] the facts and draw[s] reasonable

inference[s] in the light most favorable to" Emery, as he is "the party opposing the summary

---

[10] Emery Depo. at 78 (Dkt. 52-1 at 16).

[11] *Id.* at 79 (Dkt. 52-1 at 17).

judgment."[12]  But because the case concerns a qualified immunity defense, the court considers "only the facts that were knowable to the defendant officers."[13]

The parties in their briefing dispute only a few facts, most notably: 1) whether Emery heard the tow truck driver turn a key and unlock the steering wheel on his car; 2) whether Emery's car was in motion due to winching or to actually being driven by the tow truck driver when Emery reached into the car to get his keys; 3) whether Emery was ever told he was going to be handcuffed; 4) whether Emery was screaming profanity at the Officers and accusing them of wanting to steal his property; and 5) whether Emery's left arm was pinned underneath his body by the Officers, making it impossible for him to comply with commands to show both of his hands.  The court has overruled Salt Lake City's objection to Emery's testimony concerning whether he could have heard the driver unlock the steering wheel and the car's lack of movement at the time he reached inside.  And, Emery's version of the underlying facts—that he had not been told he was going to be handcuffed, was not screaming, and that his left arm was pinned under his body by Officers Stumm and Stayner—governs at this stage when the court considers the Defendants' entitlement to summary judgment.

Other purported disputes the parties identify in the briefing largely are not genuine disputes of facts, but are differing characterizations of facts, supplementations of the other side's facts, or disputes about whether offered facts are relevant to the court's analysis.[14]  Though the

---

[12] *Cavanaugh v. Woods Cross City,* 625 F.3d 661, 662 (10th Cir. 2010) (*Cavanaugh I*) (citations omitted).

[13] *White v. Pauly*, 137 S.Ct. 548, 550 (citing *Kingsley v. Hendrickson*, 576 U.S. _____, 135 S.Ct. 2466, 2474 (2015)).

[14] For example, Emery contends that it was not possible for him to comply with the Officers' orders to give them his keys or his left hand, as it was secured underneath his body because the Officers had pinned Emery down and Tased him.  Defendants repeatedly contend that Emery's "claimed reason for not complying is not relevant to the Court's reasonableness analysis." Defendants' Reply at 6-9 (Dkt. 75 at 9-12), to Plaintiff's Response to Facts 13, 15, 16, 17, 24, 29, and 31. The court disagrees with the Defendants and finds that under the facts it must accept in this case this fact is relevant—it can be inferred that the Officers, securing Emery on to the ground, would understand they were the reason his compliance with their commands was challenging at best, and impossible at worst, by pinning his left

characterizations and supplementations may be disputed at another stage, the court at summary judgment views the facts and reasonable inferences from them in a light favorable to Emery. With this in mind, the court considers the following facts in resolving Defendants' Motion.

On March 30, 2010, Salt Lake City Police Officer Timothy Stumm pulled over a car that Don Emery was driving for having an expired registration tag on the license plate. The stop occurred at 55 South on 700 East Street in Salt Lake City, in the early evening.[15] Officer Stumm notified Emery of the reason for the stop, retrieved Emery's driver's license without incident, and returned to his car to run checks.[16] The checks confirmed that the car registration was expired and further revealed that Emery's driver's license was suspended.[17]

Officer Stumm wrote a citation for the two violations and, knowing he needed to impound Emery's car, called for another officer to help. This was standard practice in those circumstances,[18] and Officer Stumm knew people may become upset when their car is towed.[19] Salt Lake City Police Officer Kevin Stayner responded to the scene to assist Officer Stumm.

Officer Stumm then approached Emery's car again to inform him of the citations and that his car would be impounded. Officer Stumm asked Emery to exit his car. Emery complied.

---

arm underneath his body. The fact that they could have observed Emery would be incapable of compliance in the position in which they held him seems relevant to whether the methods they subsequently employed to gain his compliance—punching and Tasing with his arm still pinned underneath—were reasonable or excessive under the Fourth Amendment. Likewise, Defendants dispute the materiality of Emery's fact that the Officers "searched [him] when they were going to impound his car." Defendants' Reply at 10 (Dkt. 75 at 13). But the court views this fact as highly relevant, in that it suggests that it was "knowable to"—indeed, actually known by—the Officers that Emery did not have a weapon already on his person that he might be reaching for, when they tackled and pinned him to the ground, punched, and Tased him.

[15] Dkt. 52 at 1; Stumm Depo. at 17 (Dkt. 52-1 at 29).

[16] Dkt. 52 at 1-2; Stumm Depo. at 20 (Dkt. 52-1 at 31).

[17] Dkt. 52 at 2; Stumm Depo. at 20 (Dkt. 52-1 at 31).

[18] *Id.*

[19] Dkt. 52 at 9, Defs.' Fact ¶ 10 (undisputed).

Officer Stumm then searched Emery's person, giving him a "pat-down."[20]  This too was accomplished without incident.

Officer Stumm told Emery he would need to remove any valuables from his car.  Emery did so without help, though he does walk with an obvious limp.  He placed his belongings on a grassy area east of the sidewalk running along 700 East.[21]  The Officers watched Emery as he removed an oxygen tank from the car, but could not recall other specific items he removed.[22]  Officer Stumm did not observe anything of concern as Emery emptied his car.[23]  Then, the car was inventoried.[24]

At some point, a flatbed tow truck arrived at the scene.  The Officers gave the tow truck driver Emery's car key, which the Officers had earlier obtained from Emery.  Emery was at that time on the grass by his belongings, just east of the vehicles.[25]  The Officers were standing together, some distance from Emery, at the front of Officer Stump's patrol car, behind (south of) the tow truck and Emery's car.[26]  There is no evidence that Officer Stumm or Officer Stayner gave Emery any orders, let alone any instructions or suggestions, on where he was required to be

---

[20] Emery Depo. at 70 (Dkt. 52-1 at 13).  In addition to testifying during his deposition that he was searched, Emery in his opposition briefing purports to support this fact by citing to his new affidavit.  (Dkt. 66-1).  The court cannot find support for this statement in the affidavit.  But as noted, he testified to that fact in his deposition, and that testimony is set forth in the excerpt Defendants attach to their opening brief.  Defendants' response to this fact is simply to state "Disputed, but not material to resolution of this motion."  Defendants' Reply Memorandum in Support of Motion for Summary Judgment (Dkt. 75) at 10.

[21] Id. at 7-8, Defs.' Facts ¶¶ 2-3 (undisputed); Stumm Depo. at 28 (Dkt. 52-1 at 35).

[22] Stumm Depo. at 37 (Dkt. 52-1 at 41); Stayner Depo. at 18 (Dkt. 52-1 at 80).

[23] Stumm Depo. at 36 (Dkt. 52-1 at 40).

[24] Stumm Depo. at 30-31, 46 (Dkt. 52-1 at 36-37, 49).

[25] Id. at 40 (Dkt. 52-1 at 48).

[26] Id. at 40, 46; Dkt. 52-1 at 48, 49.  Emery's car had been pulled over as it headed northbound on 700 East.

or what he was required to do while the tow truck driver worked—such as that he was to sit and wait in a certain area, or that he was no longer allowed to approach his car.[27]

The tow truck driver hooked a chain to the front of the car, put the car into neutral, and was winching it onto the flatbed truck while sitting inside the car in the driver's seat.[28] At that point, Emery realized he did not have his house keys.[29] He walked toward his car, which was not moving at that time and had the engine turned off.[30] There is no evidence in the record now before the court that Officers Stumm or Stayner saw Emery heading toward his car and ordered him to stop. When he got to his car, Emery said nothing to the tow truck driver, opened the passenger door, reached into the car, and took the key from the ignition—thinking his house keys would be attached.[31]

Apparently by that point, Officers Stumm and Stayner saw Emery at his car and became concerned that he was attacking, or about to attack the tow truck driver. They moved to respond.

But Emery had not attacked the driver at all. And before the Officers got to him, he had gotten out of the car with the key in his left hand, turned and walked about three feet from the car to the sidewalk, and realized despite his efforts he still did not have his house keys.[32]

---

[27] Indeed, Officer Stumm testified that he had no recollection of any interaction with Emery in between Emery removing his belongings from his car and when he alleges Emery went toward his car again. Stumm Depo. at 33-34 (Dkt. 52-1 at 38-39).

[28] Emery Depo. at 77- 78 (Dkt. 52-1 at 15-16). As has been discussed, there is a dispute of fact as to whether the tow truck driver was moving the car onto the flatbed truck by winching it or by driving it up. Officers Stumm and Stayner testified in their depositions that the tow truck driver turned on the ignition and drove Emery's car up onto the flatbed. Stumm Depo. at 46, Dkt. 52-1 at 49; Stayner Depo. at 30, Dkt. 52-1 at 83. Emery testified that the driver was going to winch it up, but had not yet begun to move it, when he approached the car. On these disputed facts, the court accepts Emery's account for purposes of summary judgment.

[29] Emery Depo. at 77 (Dkt. 52-1 at 15).

[30] Id. at 78 (Dkt. 52-1 at 16); Emery Aff. at 2 (Dkt. 66-1 at 2).

[31] Id.

[32] Emery Depo. at 78 (Dkt. 52-1 at 16); Emery Aff. at 2 (Dkt. 66-1 at 2).

Officers Stumm and Stayner nonetheless together grabbed and tackled Emery onto the grassy area east of the sidewalk alongside the road.[33] Officer Stayner was on Emery's right side, and had partial control of his right arm. Officer Stumm was on Emery's left side, where Emery's left arm was under his body, making it impossible for the Officers to cuff both hands.

Emery contends he was never told he was being arrested or warned he was going to be handcuffed. The Officers instructed Emery to stop struggling, give them his keys, and show his hands. But his left arm, with the keys in hand, was pinned under his body. His right arm was extended and pinned under an officer's arm.[34] Officer Stumm then punched Emery's left shoulder three times with a closed fist. After warning Emery that if he continued to struggle and did not give the Officers his hands,[35] Officer Stayner used his Taser on Emery's right shoulder for about five seconds, applying the Taser's 'drive stun' mode[36] and causing Emery to writhe in pain but leaving his left arm still pinned underneath him.[37] Officer Stumm tried to use a baton to pry out Emery's left arm, but the arm was still pinned beneath his body.[38] Officer Stumm then kneed Emery's side,[39] resulting in a fractured rib and bruised kidney.[40] Officer Stayner then Tased Emery once again, using drive stun mode, for an extended period.[41] Emery's body

---

[33] Emery Depo. at 81 (Dkt. 52-1 at 19); Emery Aff. at 8 (Dkt. 66-1 at 8).

[34] Emery Aff. at 3 (Dkt. 66-1 at 3).

[35] Dkt. 52 at 10, Defs.' Fact ¶ 20 (undisputed).

[36] *Id.* at 11, Defs.' Fact ¶¶ 22-23 (undisputed).

[37] *Id.* at 11, Defs.' Fact ¶ 25 (undisputed); Emery Aff. at 3 (Dkt. 66-1 at 3).

[38] Emery Aff. at 3 (Dkt. 66-1 at 3).

[39] Dkt. 52 at 11, Defs.' Fact ¶ 27 (undisputed); Emery Aff. at 3 (Dkt. 66-1 at 3).

[40] Emery Aff. at 3 (Dkt. 66-1 at 3).

[41] Emery Aff. at 3 (Dkt. 66-1 at 3).

relaxed, the Officers placed his hands into cuffs, and he was taken to an emergency room via ambulance.[42]

### C. Procedural Background

Emery filed suit in September 2013.[43]  In June 2014, Defendants filed a Motion for Judgment on the Pleadings,[44] arguing based only on the Complaint, Emery's claims failed as a matter of law.  Briefing on that motion concluded on September 23, 2014.[45]  On September 26, 2014, the court set a hearing for January 13, 2015.  At that hearing, the parties stipulated to the dismissal of all Emery's causes of action except his first, for Excessive Force in Violation of the Fourth Amendment brought pursuant to 42 U.S.C. § 1983 against Officers Stumm and Stayner.  Applying the same qualified immunity legal principles relevant to the present Motion and discussed below, the court ruled that this cause of action survived Defendants' motion.[46]

Two and a half years later, on June 22, 2017, Defendants filed the present Motion for Summary Judgment.[47]  After receiving Emery's opposition in September, the court set a hearing for January 2018.  At the parties' request, the court moved the hearing to February 20, 2018.  The court heard argument on the Motion on February 20, 2018.  David Pace appeared for Emery.  Samantha Slark appeared for Officer Stumm, Officer Stayner, and Salt Lake City.

## II.    Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(a), the court may grant Defendants' Motion for Summary Judgment only if they "show[] that there is no genuine dispute as to any material fact

---

[42] Dkt. 52 at 12, Defs.' Facts at ¶¶ 32-33 (undisputed); Emery Aff. at 3 (Dkt. 66-1 at 3).

[43] Dkt. 4, Complaint.  Defendants filed their Answer on October 29, 2013.  (Dkt. 8.)

[44] Dkt. 16.

[45] Dkt. 27, Reply.

[46] Dkts. 30 and 31.

[47] Dkt. 52.

and [are] entitled to judgment as a matter of law."[48]  Below, the court first considers whether Salt

Lake City is entitled to summary judgment, then turns to the arguments advanced by Officers

Stumm and Stayner.

### A.  Emery Has Not Established, and Does Not Even Argue, a Basis for Liability against Salt Lake City

The City moves for summary judgment, arguing Emery has set forth no basis under

which it may be liable to him.  Emery asserts no distinct claim against Salt Lake City in his

Complaint, and he does not contest the portion of the Defendants' motion relating to Salt Lake

City.  For these reasons, the court concludes that Salt Lake City is entitled to summary judgment.

### B.  The Officers are Not Entitled to Qualified Immunity as a Matter of Law

Officers Stumm and Stayner move the court for summary judgment on Emery's lone

Fourth Amendment excessive force claim, arguing that qualified immunity shields them from

suit.  Public officials sued for alleged constitutional violations may assert this defense, which

"provides 'immunity from suit rather than a mere defense to liability' . . . [and] prevents undue

interference with public affairs by cutting short baseless litigation against government actors."[49]

Qualified immunity "attaches when an official's conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known."[50]

Because Officers Stumm and Stayner assert this defense, Emery bears a "heavy two-part

burden"[51] to show that: 1) the Officers violated a constitutional right; and 2) the right was clearly

established at the time of the alleged violation in March 2010.[52]  In evaluating whether Emery

---

[48] Fed. R. Civ. P. 56(a).

[49] *Mecham v. Frazier*, 500 F.3d 1200, 1203 (10th Cir. 2007) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

[50] *White*, 137 S.Ct. 548, 551 (2017) (quotations omitted).

[51] *Mecham*, 500 F.3d at 1204 (citations omitted).

[52] *Saucier v. Katz,* 533 U.S. 194, 201-02 (2001).

has met this burden, the court is guided by the Supreme Court's refrain that qualified "immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"[53]

With these principles in mind, the court discusses below whether Emery has overcome the Defendants' Motion for Summary Judgment by showing Officers Stumm and Stayner violated his Fourth Amendment rights, and that those rights were clearly established at the time of the traffic stop.

### 1. Constitutional Violation

The Fourth Amendment ensures the right of citizens "to be secure in their persons ... against unreasonable . . . seizures." The "threshold inquiry in the qualified immunity analysis is whether, taking [Emery's allegations] as true," Officers Stumm and Stayner violated his "Fourth Amendment right to be free from unreasonable seizers."[54] "Police officers can violate that right by employing excessive force when making a seizure or an arrest."[55] The inquiry into whether the force an officer uses is "excessive" or "reasonable" is an objective one, "depending on the 'facts and circumstances of each particular case.'"[56]

In conducting this inquiry, the court focuses "on the facts confronting the officers, not 'their underlying intent or motivation.'"[57] In evaluating the reasonableness of the seizure the Defendant Officers effected, the court balances the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."[58] And "reasonableness is judged 'from the perspective of a

---

[53] *White,* 137 S.Ct. at 551 (quoting *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015)).

[54] *Mecham*, 500 F.3d at 1204 (citations omitted).

[55] *Cavanaugh v. Woods Cross City*, 718 F.3d 1244, 1248–49 (10th Cir. 2013) (*Cavanaugh II*).

[56] *Cavanaugh II,* 718 F.3d at 148 (quoting *Graham v. Connor,* 490 U.S. 386, 396 (1989)).

[57] *Id.* (quoting *Graham,* 490 U.S. at 397).

[58] *Mecham*, 500 F.3d at 1204 (citations omitted).

reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"[59]  This inquiry

recognizes "the fact that the officers may be forced to make split-second judgments" under trying

conditions."[60]  Here, the "qualified immunity analysis . . . is limited to 'the facts that were

knowable to the defendant officers' at the time they engaged in the conduct in question.'"[61]

"Facts an officer learns after the incident ends—whether those facts would support granting

immunity or denying it—are not relevant."[62]  Ultimately, the question that must be answered is

"whether the officers' actions are objectively reasonable in light of the facts and circumstances

confronting them."[63]

The Supreme Court in *Graham v. Connor*[64] enunciated factors to be weighed in this

analysis.  They "include, but are not limited to, '[1] the severity of the crime at issue, [2] whether

the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is

actively resisting arrest or attempting to evade arrest by flight.'"[65]  And a police officer "who has

a reasonable but mistaken belief about a suspect's dangerousness may nevertheless be justified in

using more force than is necessary."[66]  As discussed below, and viewing the facts before it in the

light most favorable to Emery, the court concludes that these factors suggest Officers Stumm and

Stayner employed excessive force in violation of Emery's Fourth Amendment rights.

---

[59] *Id.* (quoting *Graham*, 490 U.S. at 396).

[60] *Id.* (quoting *Graham*, 490 U.S. at 396-397).

[61] *Hernandez v. Mesa*, 137 S.Ct. 2003 (2017) (quoting *White*, 137 S.Ct. at 550).

[62] *Id.* (vacating Fifth Circuit decision affirming dismissal of claims against border patrol agent who shot a Mexican teen on basis of qualified immunity; finding court of appeals' immunity determination was erroneously based on facts concerning the victim's nationality unknown to the agent at the time of the shooting).

[63] *Graham,* 490 U.S. at 397.

[64] 490 U.S. 386.

[65] *Cavanaugh II,* 718 F.3d at 148 (quoting *Graham*, 490 U.S. at 396).

[66] *Id.* (citing *Thomson v. Salt Lake Cnty.,* 584 F.3d 1304, 1314 (10th Cir. 2009)).

The court preliminarily observes that the intrusion on Emery's Fourth Amendment interests was significant. He was an unthreatening, older man who physically seized, tackled, and pinned upon the ground with his left arm stuck underneath him while he was punched, kneed, and repeatedly Tased.

Turning to the *Graham* factors, the court first considers whether the crime at issue was severe. It was not. Emery was initially stopped because it appeared his vehicle registration had expired. It was later discovered that he also had a suspended driver's license. These are traffic infractions, not the sort of crimes that might put officers on increased alert that force may be necessary due to any likely threat. And the Officers did not act to the contrary. There is no evidence before the court that they were particularly concerned about Emery or his infractions as the car was impounded. The Officers stood together near a police car away from Emery while he removed his belongings, put them on a grassy area, and the tow truck driver began loading his car. There is no evidence that the Officers instructed Emery as to where he should be or what he should be doing while his car was impounded—such as that he should remain in a specific place or not approach his car. Thus, when he did so, he was not violating any direction from the Officers.

Still, Defendants maintain that Emery's conduct prior to their tackling him was criminal, and that the Officers were justified in jointly grabbing, tackling, and engaging in substantial efforts to handcuff him because he "interfered with the officers' impounding of his vehicle and assaulted or attempted to assault the tow truck operator."[67] The facts the court is required to accept at this stage, set forth above, establish none of those allegations.

---

[67] Dkt. 52 at 14.

First, Defendants have not clearly articulated how Emery's conduct interfered with impounding his car. To the extent this contention rests on Defendants' dispute of Emery's fact that the car was not being driven at the time Emery retrieved his key, the court is required at this stage to accept Emery's version of the disputed facts. Second, there is no evidence before the court at present that Emery interfered with the impounding or assaulted or even attempted to assault the tow truck driver.

But if not criminal, Defendants repeatedly characterize Emery's conduct in approaching his own car before it was to be towed away was "irrational,"[68] "bizarre and unexplained,"[69] and "bizarre and unusual."[70] Apparently based on what they viewed as this "bizarre" behavior, the Officers contend they were justified in applying the level of force they employed to handcuff Emery. The court disagrees.

Under the facts the court has already recounted and is required to accept at this stage, as well as the inferences it must make in Emery's favor, the court cannot conclude his conduct was irrational or bizarre, let alone a serious crime. It was conduct that appeared fairly explainable in daily life. And the Officers knew the following when they observed it: an older man who had, during their entire interaction concerning minor traffic infractions, been compliant and had not raised any concerns in the Officers' eyes, who had just emptied the belongings out of his car without incident, who had not been instructed on where to be or to stay away from his car, returned momentarily to his car. One worrisome reason for doing so might be to interfere with the tow operation. Others that readily come to mind, particularly where Emery had been wholly compliant with every request and had given the Officers no reason to be concerned, are to ask a

---

[68] Dkt. 52 at 14.

[69] Dkt. 75 at 15 n.51, 17, and 19.

[70] *Id.* at 23.

question of the driver or retrieve an item from the car. And while this court is cognizant that its "role is not to second guess on-the-ground decisions with the benefit of 20/20 hindsight," it is also "not objectively reasonable [for the Officers] to ignore specific facts as they develop (which contradict the need for this amount of force) in favor" of using substantial force without warning or employing less intrusive means in order to combat a possible, but not probable, safety concern.[71] It would admittedly have been eminently more cautious of Emery to ask the Officers for help before he approached his own car, but they were not particularly concerned about him, were standing together away from him, and under the totality of the circumstances, the court cannot conclude Emery's behavior was bizarre—let alone akin to a serious crime.

Under the *Graham* factors, the court next considers whether Emery posed an "immediate threat" to anyone when he was seized. Officers Stumm and Stayner contend that they tackled Emery out of a concern that Emery might be attempting to attack the tow truck driver when he reached into his car, because impounding a car can sometimes create a tense situation.[72] And they contend that once they tackled Emery, and he had his arm "tucked underneath his body,"[73] they needed to employ the force they did because they were concerned he might be "attempting to access a weapon."[74] But under the totality of facts the court accepts at this stage—and which were knowable to the Officers—Emery's conduct did not pose an immediate threat to anyone.

As recounted in considering the first factor, Emery was an older, somewhat frail man who had been compliant with all instructions from the Officers up to the point he was tackled.

---

[71] *Cavanaugh I,* 625 F.3d at 666.

[72] On this factor, Defendants also assert that it was especially dangerous for Emery to reach inside the car and get the key out of the ignition, because the engine was on and the car was moving. Dkt. 52 at 15. As the court has discussed, these facts are disputed by Emery. The court accepts at this stage Emery's assertion that the car was in neutral, not moving, and the engine was not on at the time he got his key.

[73] Dkt. 52 at 15.

[74] *Id.*

Emery had no weapons, having been checked for weapons incident to being told his car would be impounded. He had placed on the grass the belongings he removed from the car—none of which were particularly memorable to the Officers, as a weapon presumably would be. And his car had been inventoried—which would have revealed any weapons left inside. Though he had quickly reached into his car, he then walked about three feet away from his it, was calm, and looking at the keys in his hand when he was tackled. His conduct in approaching his car was not in breach of any instruction given him, and a reasonable officer could imagine several plausible and peaceful reasons he would approach his own car before it was taken. And, the tow truck driver had in fact not been harmed, and was in no immediate danger of being harmed at the time Emery was tackled to the ground without warning—all facts knowable to the Officers. The court finds under all of these facts that a reasonable officer would not view Emery as posing any immediate threat to anyone, such that tackling him to the ground and applying significant force in an effort to handcuff him was an appropriate response.

Finally, the court considers whether Emery attempted to resist or evade arrest. Emery was not arrested. When he was tackled, he was not disobeying any orders, threatening anyone, or fleeing a scene. He was standing calmly three feet from his car. But the parties dispute, or at least urge differing inferences, as to whether Emery resisted or failed to comply with commands from Officers Stumm and Stayner after he had been tackled. Officers Stumm and Stayner claim that Emery refused to comply with demands that he provide both his arms to them for handcuffing—that he kept his left arm "tucked under" him. A refusal to comply with an officer's command clearly can amount to resistance. But the notion of resistance suggests one has a choice to make in deciding not to comply with the commands. Here, Emery claims he was rendered unable to comply due to the Officers' actions in pinning him down and making it

impossible for him to get his left arm out from under him. He contends he cannot be said to be voluntarily resisting when he was pinned down by two Officers. And the Officers, the ones who allegedly pinned him, would be aware of this predicament—the relevant facts would be "knowable" to them.[75] Thus, under Emery's version of the facts, the Officers were aware that he could not comply with their commands to provide both arms to them for handcuffing. There are no other allegations of any refusal to comply with commands at any other point leading up to Emery being tackled.

These facts are in sharp contrast the three cases upon which Defendants primarily rely. In each, the use of force was employed after the plaintiff initially refused to comply with clear police instructions, and thereafter further resisted submitting to the police.

First, in *Hinton v. City of Elwood*,[76] officers were called to deal with a threatening suspect who then refused their requests to stop walking away, resisted being handcuffed, and eventually bit an officer. In light of the "resistance admitted to by the [plaintiff]", the Tenth Circuit affirmed summary judgment in favor of the defendants on the grounds that the officers had not used excessive force in violation of the plaintiff's Fourth Amendment rights when they wrestled the plaintiff to the ground and used a stun gun to subdue him.[77]

---

[75] To illustrate, an officer might order a dangerous suspect to raise his arms in the air for safety purposes and to facilitate arrest. A refusal to do so could amount to resistance. But if an officer first handcuffs the suspect's arms behind his back, then orders him to raise his arms, his refusal to do so where physically impossible cannot fairly be called resistance. And in that illustration, the officer making it impossible to comply with his commands is aware of the situation--the facts are knowable to him. In contrast, an officer might shout the same order to a person who is hearing impaired or does not understand the language spoken by the officer. The person may fail to raise his arms, but not necessarily be choosing to resist, but unless the officer knew the person could not hear, or did not understand him, the officer could reasonably assume the person was resisting.

[76] 997 F.2d 774 (10th Cir. 1993).

[77] *Id.* at 781-82.

And in *Mecham v. Fraizer*,[78] the plaintiff had been pulled over on Interstate-15, learned her car would be impounded, and thereafter refused multiple commands from officers— including to end a cell phone call and to exit the car when the tow truck arrived. After repeatedly refusing to comply with these commands, she was pepper-sprayed, removed from the car, and handcuffed.[79] She later sued the officers, and in the district court successfully defeated the officers' qualified immunity summary judgment motion. The Tenth Circuit reversed that denial, in part because under the *Graham* factors, the officers' conduct over the course of an evolving encounter with the plaintiff in view of her refusal to comply with express commands was reasonable under the Fourth Amendment.[80]

Finally, in *McNeil v. Anderson*,[81] the Tenth Circuit affirmed summary judgment on qualified immunity grounds in favor of an Oklahoma State Trooper whom the plaintiff claimed employed excessive force on him in the course of a traffic stop, leaving him with an injured back and emotional trauma. The plaintiff had been speeding and driving erratically on an interstate highway in the dark of night when he was stopped. Upon approaching the car, the officer recognized the plaintiff as someone with a dangerous history "from an earlier traffic encounter in which [he] was exposed to a chemical vapor spewing" from the plaintiff's car, and also because he knew the plaintiff had previously assaulted another officer.[82] Knowing this, the officer ordered the plaintiff out of his car and to place his hands behind his back. The plaintiff told the officer he was getting a phone from his pocket, and the officer responded that if he pulled

---

[78] 500 F.3d 1200 (10th Cir. 2007).

[79] 500 F.3d at 1202-03.

[80] *Id.* at 1205-06 (referring to plaintiff's citation of *Martinez v. New Mexico Dep't of Public Safety*, 47 Fed.Appx. 513 (10th Cir. 2002)).

[81] 258 Fed.Appx. 205 (10th Cir. 2007).

[82] *Id.* at 206.

anything out other than a phone, he would be killed.  The officer then repeatedly told the plaintiff to put his hands behind his head.  In defiance of this order, the plaintiff threw something.  So, the officer ordered the plaintiff to lay down with both hands behind his back.  A scuffle ensued, ending with the plaintiff running in front of his truck and the officer retrieving a gun from his car.  The officer again ordered the plaintiff to lie down in the ditch, or the officer would kill him.  The plaintiff finally complied with the officer's orders, and was eventually taken into custody.[83]

In evaluating whether summary judgment in favor of the officer was warranted the Tenth Circuit noted that the ultimate question was whether the officer's "actions [were] objectively reasonable in light of the facts and circumstances confronting [him]."[84]  The court concluded they were.  The officer's knowledge of the plaintiff's history left him with reasonable safety concerns, and from the officer's perspective, "the rapidly-developing encounter" remained filled with danger where the plaintiff failed to comply with the officer's orders, struggled with the officer, and then "actively resist[ed] arrest."[85]

The facts this court must accept at this summary judgment stage are quite distinct from those in *Hinton*, *Mecham*, and *McNeil*.  Under the facts before the court, it was knowable to both Officers Stumm and Stayner at the time they jointly tackled Emery, pinned him, punched and kneed him, broke his rib and bruised his kidney, and Tased him, are that:

- Emery was an older, somewhat frail man;

- He had been wholly compliant during a drawn-out but quite routine traffic stop and had given the Officers no reason for alarm or to carefully guard him.  Rather, they stood away from him together by one of the patrol cars;

---

[83] *Id.*

[84] *Id.* at 207 (quoting *Graham*, 490 U.S. at 397).

[85] *Id.* at 208.

- Emery was not personally armed and had no weapon in his car;

- The Officers had not instructed Emery to stay in any certain area, or stay away from his car;

- Emery was therefore not disobeying any order or suggestion from the Officers when decided to approach his car—an action the court finds the Officers should not reasonably viewed as "bizarre" under the circumstances;[86]

- Though there are nefarious reasons too, there are multiple legitimate reasons that someone whose car was about to be towed might approach their car, including to ask a question of the driver or get a belonging they had forgotten;

- The tow truck driver had not been assaulted—indeed, Emery had not attempted to harm him in any way;

- Emery was feet away from his car, and the tow truck driver, when the Officers tackled him;

- The Officers were pinning Emery to the ground with his left arm under him at the same time they were demanding he show them his hands.

The court finds that under the facts it must accept at this stage, Emery has established that both Officers unseasonably employed excessive force in violation of Emery's Fourth Amendment rights. Following the alleged joint tackling, both Officers worked to pin Emery to the ground. Officer Stumm punched and kneed him, and Officer Stayner Tased him. And the court finds support for this conclusion in *Casey v. City of Federal Heights*,[87] discussed more fully below, where the Tenth Circuit concluded that officers' use of "an arm-lock, a tackling, a Tasering, and

---

[86] This is not to say the Officers were not reasonably aware that in the universe of possible conduct, Emery could have meant to harm the tow truck driver. But in addition to this possibility that an unsafe situation might be afoot, there are multiple legitimate—indeed, more likely, reasons for Emery to go to the car.

[87] 509 F.3d 1278 (10th Cir. 2007).

a beating—against one suspected of innocuously committing a misdemeanor who was neither violent not attempting to flee" violated the Fourth Amendment.[88]   The similar facts Emery relies on are sufficient to establish his claim for excessive force in violation of his Fourth Amendment right against unreasonable seizure.

### 2. Clearly established right

Emery additionally bears the burden to show his Fourth Amendment right to be free from excessive force he alleges the Officers violated was clearly established at the time of the traffic stop.  "The 'dispositive inquiry in determining whether a right was clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"[89]   The court must inquire whether the right Emery has identified "was sufficiently clear that a reasonable officer would understand that what he is doing violates that right."[90] Emery may satisfy his burden by identifying a Supreme Court or Tenth Circuit decision on point, "or clearly established weight of authority from other courts" suggesting that the Officers' actions violated his rights.[91]   But as the Supreme Court recently emphasized in *Mullenix v. Luna,*[92] this analysis must be undertaken "in light of the specific context of the case, not as a broad general proposition," and this "specificity is especially important in the Fourth Amendment context, where . . . '[i]t is sometimes difficulty for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer

---

[88] *Id.* at 1282.

[89] *Hernandez,* 137 S.Ct. at 2007 (quoting *Saucier,* 533 U.S. at 202).

[90] *Mecham,* 500 F.3d at 1206.

[91] *Id.*

[92] 136 S.Ct. 305 (2015).

confronts."[93]  Any precedent cited must put law enforcement on notice that in view of the facts of the case, it was "beyond debate" that their actions would amount to excessive force.[94]

Emery cites two Tenth Circuit cases to meet this burden: 1) *Cavanaugh v. Woods Cross City (Cavanaugh I),*[95] and 2) *Casey v. City of Federal Heights.*[96]  Defendants correctly point out that the court cannot directly rely on the 2010 decision in *Cavanaugh* as it issued months after the March 2010 traffic stop at issue, and therefore could not have put the Officers on notice that their alleged conduct violated the law.  But the court may consider *Casey*, decided three years before the events underlying this case.[97]

In *Casey,* Mr. Casey had unsuccessfully challenged a traffic ticket in court.  While still at the courthouse, the judge gave him his court file to appeal the decision.  Because Casey was required to pay a fee for the appeal, but had left his money in his truck, he sent his eight-year-old daughter to use the restroom while he went to the parking lot.[98]  He took his court file with him—possibly a misdemeanor under applicable state law.  Officer Sweet learned that Casey left the building with the file, and met him as he was on his way back to the courthouse.  Officer Sweet asked Casey for the file, and Casey held out his briefcase with the file clearly visible. Officer Sweet did not take the file, so Casey moved around the officer to take the file to the cashier.  Officer Sweet grabbed Casey's arm and put it in an arm-lock.  Casey moved his arm

---

[93] *Id.* at 308 (citations omitted).

[94] *Id.* at 309 (citations omitted).

[95] 625 F.3d 661, 662 (10th Cir. 2010).

[96] 509 F. 3d 1278 (10th Cir. 2007).

[97] It bears noting that Tenth Circuit in *Cavanaugh I* relied exclusively on *Casey* to find that the officer defendant had violated clearly established Fourth Amendment excessive force law when he Tased an unarmed woman who had been involved in a domestic dispute, who had been reported to previously have had a knife, and was under the influence of alcohol and pain medication.  There, the Tenth Circuit in a pointed analysis found *Casey* clearly governed, such that the court "need not engage in extended inquiry," and should have notified the officer that he "could not use his Taser on a nonviolent misdemeanant who did not pose a threat and was not resisting or evading arrest without first giving a warning."  625 F.3d at 666-67.

[98] *Id.* at 1279-80.

without breaking the officer's grip and started to walk to the courthouse with the file. Officer Sweet jumped on Casey's back, ripping Casey's shirt in the process. Officer Sweet never told Casey that he was under arrest, and never advised him to stop resisting. Another officer, Officer Lor, arrived and observed the scene for possibly a few minutes, and Tased Casey.[99] Casey was then taken to the ground, handcuffed, and Tased again by yet another officer—Officer Losli.[100] Casey kept trying to get up, but was overpowered by the officers and taken into a patrol car.

Casey sued Officers Sweet and Lor for excessive force under the Fourth Amendment and § 1983. The district court granted both officers' motions for summary judgment.[101] The Tenth Circuit reversed, concluding that although it could not locate a prior case with precisely the same fact pattern, the officers had violated Casey's clearly established Fourth Amendment rights. The court explained that under the circumstances—particularly in light of Casey's nonthreatening behavior, a reasonable officer could not have found a legitimate justification for the excessive force conduct alleged, and "for failing to take some steps to mitigate the fracas that ensued."[102] The court explained that "force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest."[103]

The court finds *Casey* compelling, and concludes that it clearly established three years before Emery's traffic stop right under the Fourth Amendment to be free from the tackling, punching, and Tasing Officers Stumm and Stayner employed. As in *Casey,* the record here suggests Emery was not threatening anyone or fleeing, had no weapons, had not disobeyed any

---

[99] *Id.* at 1280.

[100] *Id.*

[101] Casey had also sued their employer, the City of Federal Heights, and its Police Chief under municipal and supervisory liability theories, but the district court concluded that those claims failed when the officers obtained summary judgment.

[102] *Id.* at 1285.

[103] *Id.* (citing *Graham*, 490 U.S. at 396).

instructions from the Officers, and was in no danger of harming anyone. And, to the extent that the Officers eventually instructed Emery to show them his hands and he did not do so, his non-compliance was not voluntary where the Officers were jointly pinning him to the ground. On these facts, *Casey* suggests that Emery had a clearly established right to be free from continued punching, Tasing, and kneeing by Officers.

Still, Defendants contend that Emery's reliance on *Casey* is misplaced, noting that the Tenth Circuit in *Aldaba v. Pickens*[104] recently concluded that the family of a man who had been Tased by police officers before passing away could not rely on *Casey* to establish their excessive force claim. But the *Aldaba* facts are quite different than those this court must accept in deciding Defendants' Motion.

In *Aldaba,* the district court had denied three officers' qualified immunity summary judgment motion where they had Tased, tackled, and tried to handcuff a disoriented and combative hospital patient *who urgently needed injections of medication but could not be treated in his agitated state.*[105] The *Aldaba* Court concluded that none of the Taser cases cited by the family—*Casey,*[106] *Cavanaugh I,*[107] and *Cruz v. City of Laramie*[108]--or cases in which law

---

[104] 844 F.3d 870 (10th Cir. 2016).

[105] The Tenth Circuit had initially affirmed that denial. But the Supreme Court vacated that judgment following its *Mullenix* decision in which it had emphasized that in addressing only the clearly-established prong of the qualified immunity analysis in a car chase-excessive force case that the "dispositive question 'is whether the violative nature of the *particular* conduct is clearly established.'" 136 S.Ct. at 308 (quoting *Ashcroft v. al-Kidd,* 563 U.S. 731, 742 (2011)).

[106] 509 F.3d 1278.

[107] 625 F.3d 661. In *Cavanaugh I*, the Tenth Circuit relied on *Casey* in affirming the denial of qualified immunity for a Woods Cross, Utah police officer who had responded to a call from a husband that his wife—under the influence of alcohol and pain medication—had stormed out of their home with a kitchen knife following an argument in which she had also shut her husband in a closet. *Id.* at 662-63. Officer Davis approached the wife outside as she appeared to be returning home. She walked off of a walkway and across the lawn. She was not holding a knife. Officer Davis set down his clipboard and flashlight and then, without warning, Tased the wife as she stood in front of her home's concrete front steps. She spun around and struck her head on the steps. *Id.* at 663. In evaluating Officer Davis's conduct, the Tenth Circuit noted that his Tasing amounted to a "severe" Fourth Amendment intrusion, and concluded under the *Graham* factors that his use of the Taser was unjustified. Further, in

enforcement officers were accused of using excessive force against persons with diminished

mental capacity would "advise every reasonable official that Tasering [the patient] to hasten life-

saving care would amount to excessive force under the Fourth Amendment."[109]  The court

distinguished the three cases the family relied upon, noting that in the case at bar: 1) the officers

were not trying to effectuate an arrest as the officers were in the three Taser cases, or otherwise

seeking to detain persons for non-medical reasons as the officers in the diminished mental

capacity cases, but were instead seeking to calm a patient to assist medical providers in providing

care to prevent death; and 2) the officers "tried to calm [the patient] and Tasered him only after

their efforts failed."[110]  Thus, no case rendered beyond debate that the officers' Tasering to

"avoid a full-out physical confrontation with a patient whose life depended on immediate

treatment" amounted to a Fourth Amendment violation.[111]

 Thus, the court is unpersuaded by the Defendants' argument that, as in *Aldaba,* this court

should not look to *Casey.*  Rather, the court concludes that *Casey* places beyond debate that the

---

determining whether Officer Davis was on notice of that under clearly established law, the Tenth Circuit found that *Casey* governed, and should have put Officer Davis on notice that his conduct violated clearly established law.

[108] 239 F.3d 1183 (10th Cir. 2001).  In *Cruz*, officers were called to handle a complaint concerning a naked and belligerent man—Mr. Cruz—who was running around, jumping, and yelling at an apartment building.  The officers unsuccessfully tried to calm him down.  Cruz later tried to walk past the officers, who were wielding batons.  A struggle ensued, and the "officers wrestled Cruz to the ground and handcuffed him face down" as Cruz "continued to yell and flail about."  *Id.* at 1186.  Another officer arrived, and applied a nylon restraint to Cruz's ankles.  He attached the ankle restraint to the handcuffs around Cruz's wrists—leaving no more than a foot between the ankles and wrists.  *Id.*  In other words, Cruz was hog-tied.  Cruz calmed down.  But before an ambulance arrived, his face blanched.  He died before the ambulance he was in reached the hospital, where it was found he a substantial amount of cocaine in his system.  His brother sued the officers under § 1983 and state law, and the district court concluded that they were not entitled to qualified immunity on the § 1983 claim.  On appeal, the Tenth Circuit agreed that the officers violated Cruz's Fourth Amendment rights, holding that officers may not hogtie a suspect "when an individual's diminished capacity is apparent."  *Id.* at 1188.  But, the court concluded that the officers were not on notice of this principle under clearly established law when the underlying events occurred.  Thus, the court reversed the grant of summary judgment on the § 1983 claim.

[109] 844 F.3d at 879.

[110] *Id.*

[111] *Id.*

Officers' actions taken with regard to Emery amount to excessive force in violation of the Fourth Amendment.

## CONCLUSION

Based upon the foregoing, the court GRANTS IN PART AND DENIES IN PART Defendants' Motion for Summary Judgment. Salt Lake City is entitled to summary judgment and dismissal, while Officers Stumm and Stayner are not.

DATED this 30th day of March, 2018

BY THE COURT

Honorable Robert J. Shelby
U.S. District Court Judge